CITY OF CENTRALIA v. UNITED STATES NAT. BANK OF CENTRALIA, WASH., et al.

(District Court, W. D. Washington, S. D. February 3, 1915.)

No. 25–E.

1. BANKS AND BANKING ⬤⇒288—NATIONAL BANKS—INSOLVENCY—APPLICATION OF PAYMENT.

Where, at the time an insolvent national bank closed, a city, which had designated such bank as the authorized city depositary, had therein a special deposit, and the bank had also collected for the city a draft in excess of the amount of the bond required from the bank as such depositary, the proceeds of which draft it was sought to recover as a trust fund, the city had a right to apply the amount received on the bond on the special deposit, and to apply the balance on the other account.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1105–1110, 1114–1121, 1123–1125; Dec. Dig. ⬤⇒288.]

2. BANKS AND BANKING ⬤⇒130—COLLECTIONS—RELATION BETWEEN BANK AND CUSTOMER.

Under Pierce's Code Wash. 1912, § 77—681, relative to the designation of city depositaries, and section 77—683, providing that, before any such designation shall entitle the treasurer to make deposits in the designated bank, such bank shall file a surety bond in the maximum amount of deposits designated by the treasurer to be carried in the bank, or in lieu thereof deposit bonds or warrants, where a bank designated as a city depositary collected a draft for the city in an amount exceeding the amount of its bond as depositary, neither the acquiescence of the city treasurer in the bank's retention of the amount collected as a deposit, nor the payment of interest thereon by the bank, gave the bank title to the money in excess of the amount of the bond, or changed the trust fund into a mere debt, as under the statute title could not pass to the bank without an additional bond.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 319–325, 327; Dec. Dig. ⬤⇒130.]

3. BANKS AND BANKING ⬤⇒166—COLLECTIONS—RELATION BETWEEN BANK AND CUSTOMER—PRESUMPTIONS.

A city delivered a draft for collection to the bank designated as the city depositary under Pierce's Code Wash. 1912, §§ 77—681, 77—683, the amount of the draft being in excess of the amount of the bond given by the bank as depositary. The bank sent the draft to its correspondent, an authorized reserve bank, which collected it, gave the depositary bank credit therefor, and advised it of that fact. The depositary bank charged the amount against its correspondent bank and credited it to the city, and subsequently became insolvent, having in the meantime overdrawn its account with the correspondent bank. *Held*, that it would be presumed that the depositary bank diverted from its funds on hand, and held as a trust fund, the amount collected in excess of the bond, and that its expenditures thereafter were from its own money, and that the trust fund remained untouched; the fact that the correspondent bank merely gave the depositary bank credit, without remitting coin or currency, not affecting this result.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 574–578, 586; Dec. Dig. ⬤⇒166.]

4. BANKS AND BANKING ⬤⇒288—NATIONAL BANKS—INSOLVENCY—MARSHALING OF SECURITIES.

Where a city treasurer acquiesced in the retention by a national bank designated as the city's depositary under Pierce's Code Wash. 1912, §§ 77—681, 77—683, of an amount collected by it for the city in excess of ⬤

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the amount of its bond as depositary, a temporary injunction restraining the receiver of such bank from paying a dividend to creditors, which would leave an insufficient amount to meet the city's claim, would not be denied, on the ground that under the rule for the marshaling of securities the city should first be required to seek to recover the amount from the city treasurer and his bondsmen and the city commissioner of finance, there being no assurance that sufficient would thereby be realized to make the city whole, and it being clear that before this could be ascertained the receivership would be closed up and a final disposition made of all the bank's assets.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1105–1110, 1114–1121, 1123–1125; Dec. Dig. ☞288.]

In Equity. Suit by the City of Centralia against the United States National Bank of Centralia, Wash., and another. On application for a temporary injunction. Injunction granted.

W. N. Beal, of Centralia, Wash., and Piles, Howe & Carey, of Seattle, Wash., for complainant.

A. R. Titlow, of Tacoma, Wash., for defendants.

CUSHMAN, District Judge. This is a suit to impress a trust upon funds in the receiver's hands and to obtain a preference over the general depositors and creditors of the insolvent bank. A temporary injunction is asked, restraining the receiver from paying a contemplated dividend. If this dividend is paid, it is clear that, should the complainant's preference be ultimately established, there would not remain sufficient assets to pay complainant's claim and the expenses of the receivership. By consent the matter was heard upon oral testimony. The city of Centralia is a city of less than 75,000 inhabitants. The following sections of the Washington statutes provide for the deposit of public money in such cities:

"77—681. Depositories Cities Other Than First Class. That any city or town of the state of Washington having a population of less than seventy-five thousand (75,000) inhabitants, shall upon a majority vote of its city council instruct its city or town treasurer, upon this bill becoming a law and annually thereafter at the end of each fiscal year or at such other times as may be deemed necessary by the treasurer, to designate one or more banks in the county wherein such city or town is located as depositary or depositaries of the moneys required to be kept by said treasurer."

"77—683. Security. Before any such designation shall entitle the treasurer to make deposits in such bank or banks, the bank or banks so designated shall within ten (10) days after the same is filed with the comptroller or town clerk, file with the comptroller or town clerk of such city or town a surety bond to such city or town in the maximum amount of deposits designated by said treasurer to be carried in such bank, or in lieu thereof shall deposit with the treasurer good and sufficient municipal, school district, county or state bonds, or warrants, or United States bonds, or local improvement bonds, or warrants, or public utility bonds or warrants issued by or under authority of any municipality of this state upon which interest or principal is not in default at the time of such deposit, or first mortgage railroad bonds listed on New York stock exchange, conditioned for the prompt payment thereof on checks duly drawn by the treasurer, which surety bonds or security shall be approved by the mayor and comptroller or town clerk of said city or town and such banks shall also at the same time file with said comptroller or town clerk a contract with said city or town wherein said bank shall agree to pay not less than two per centum on the average daily balances where such bal-

ances exceed one thousand ($1,000.) dollars of all municipal funds kept by such treasurer in said bank, while acting as such depositary; such payments to be made monthly to said city or town while said deposits continue in said depository; said contracts shall run to said city or town and be in such form as shall be approved by the treasurer, mayor and corporation counsel."

"135—631. Every public officer, and every other person receiving money on behalf or for or on account of the people of the state or of any department of the state government or of any bureau or fund created by law in which the people are directly or indirectly interested, or for or on account of any county, city, town or any school, diking, drainage or irrigation district, who—

"1. Shall appropriate to his own use or the use of any person not entitled thereto, without authority of law, any money so received by him as such officer, or otherwise, * * * shall be punished by imprisonment in the state penitentiary for not more than fifteen years."

"135—633. Every officer or other person mentioned in section 317 (135—631, supra) of this act, who shall willfully disobey any provision of law regulating his official conduct in cases other than those specified in said section, shall be guilty of a gross misdemeanor."

"135—635. Every state, county, city or town treasurer who shall willfully misappropriate any moneys, funds or securities received by or deposited with him as such treasurer, or who shall be guilty of any other malfeasance or wilful neglect of duty in his office, shall be punished by imprisonment in the state penitentiary for not more than five years or by a fine of not more than five thousand dollars."

Pierce's Code, 1912.

The United States National Bank, prior to the time in question, was designated as a depositary of the city's public moneys and had given a $10,000 bond to the city, as required by section 77—683. Prior to July, 1914, the city had authorized the issuance of bonds, in order to change its pumping water system to a gravity system, the proceeds of these bonds to be applied to no other purpose. A sale of the bonds to Carstens & Earles, bond buyers of Seattle, Wash., had been negotiated, and on July 10 or 11, 1914, the city treasurer of Centralia delivered the last of these bonds to the United States National Bank, with a draft upon Carstens & Earles—the exact amount of which does not appear—with instructions to forward and collect. The cashier of the bank received them, knowing the nature and purpose of the bonds—the bank making an entry to the effect: "C. A. C., Mason, 'Treas."—meaning, "Credit account, Mason, Treasurer," and immediately forwarded the bonds to its regular correspondent in Seattle, the National Bank of Commerce. This bank was not only its correspondent, but a reserve bank. The draft was paid to the National Bank of Commerce about July 13, 1914. The National Bank of Commerce gave the United States National Bank credit for the amount collected, $50,911.88, and advised the United States National Bank of that fact. On July 13th the United States National Bank entered in its books a credit to the city treasurer for this amount, charging a like amount against the National Bank of Commerce.

There had been for a considerable time—exactly how long is not disclosed—$1,000 to the treasurer's credit in the account in which this collection was entered. The city treasurer was absent from Centralia at the time of the collection and entry of this credit. The bank gave him the general credit without further advice from him. By July 21st the treasurer had returned to Centralia, and, learning that the bank had credited him with this amount, notified the vice president and manager

of the bank that an additional bond would have to be given by the bank to the city on account of this deposit. The bond was not given. No action was taken by the city commissioners regarding the deposit. The bank paid the treasurer 2 per cent. interest on the deposit, one payment for the month of July, and one for the month of August. The bank had, before this time, been paying interest to the treasurer on the $1,000 already in this account. This account was never checked against by the treasurer. The National Bank of Commerce never remitted to the Centralia Bank either currency or coin upon this collection. The United States National Bank's account with the National Bank of Commerce was drawn upon, after the collection, so that, on July 28th, it was overdrawn $1,038.64.

There was also another account of the city treasurer in the United States National Bank at the time it was closed. This was carried by the bank as a special deposit and arose as follows: The city had theretofore authorized the issuance of certain bonds for the refunding of its outstanding general expense warrants. These bonds were in denominations of $1,000, and were sold to a bank in Portland, Or. An arrangement had been made whereby the United States National Bank paid the warrants as they were presented. When an amount of these warrants had been accumulated equal to one of the bonds, that fact would be properly certified, with a list of the warrants, which would be transmitted, with the bond and accompanying draft, to the Portland bank, which would then pay a proportionate amount of the sale price of the bonds, which would be deposited in the United States National Bank and the city treasurer credited with the amount in this special account. All of the funded warrants have now been paid, except two, one for $2.20, and the other for $1.50. A small part of the funded warrants were paid from another fund, after the failure of the bank. Owing to the fact that the bonds were issued to an amount equal to the warrants to be funded and interest, and that the bonds sold for a premium, there was realized an excess over what was required to take up the warrants. This excess, with the amount of the warrants redeemed since the bank's failure, and the two unpaid warrants, amounts to $2,641.21, which amount remained in the special account in the bank at the time it was closed. On July 13th there were funds—cash and cash items—in the United States National Bank to the amount of $61,439.82. On September 19, 1914, when the bank was closed, there was $32,439.44. The smallest amount on hand between these dates was $23,527.86, on September 17th.

Section 5191, R. S. (Comp. St. 1913, § 9746), provides that a bank of the character of the one in question—

"shall at all times have on hand, in lawful money of the United States, an amount equal to at least fifteen per centum of the aggregate amount of its notes in circulation, and of its deposits." 5 Fed. Stat. Ann. 124.

The testimony shows that throughout the period in question—from July 13th until the closing of the bank, September 19th—the deposits of the bank amounted to $1,000,000, and that, in compliance with the above law, there was at all times money held on hand in the bank and its reserves in excess of $100,000. Two of the reserve banks holding

funds of the insolvent bank have refused payment to the receiver, asserting counterclaims.

[1] After the bank passed into the receiver's control, the surety company on the $10,000 bond given to the city by the bank, to qualify it as an authorized depositary to that amount, paid the face of the bond. The payment was credited by the city so as to extinguish the debt of the bank on account of the special deposit of $2,641.21; the remainder of the $10,000 bond being credited generally upon the other account of $51,911.88. Upon the payment by the bonding company, the city assigned to it $10,000 of its deposits in the bank, and the latter company has presented a claim to the receiver, as a general creditor, for $10,000. Upon the present showing, the complainant clearly had the right to apply the payment made by the bonding company as it did. This leaves for consideration the question of the fund realized from the sale of the water bonds.

[2] The city treasurer took from the bank no passbook or other evidence of its debt on account of this fund, but it is not necessary to determine whether the city treasurer intended or consented to the depositing of the money in the bank. In the face of the Washington statute, the title to this money in excess of $10,000 could not pass to the bank, without an additional bond. The payment of interest by the bank to the city treasurer for two months—even if acquiesced in by the latter—will not change the trust fund into a mere debt. The treasurer could not so accomplish indirectly that which he could not do directly. The proceeds realized from the sale of these bonds were therefore a trust fund, and it remains to consider whether it has been sufficiently identified with the funds now held by the receiver to impress a trust upon the latter.

[3] In Spokane County v. First National Bank, 68 Fed. 979, at page 980, 16 C. C. A. 81, at page 82, it was said:

"We interpret the averments of the bill to mean, as in fact it was conceded upon the argument, that the money which the receiver holds is not that which was turned over to him as such when the bank was closed, but that it is the proceeds of collections by him made since that date. If it had been alleged in the bill that at the time of its failure the bank held a sum of money equal to or less than the amount here sued for, the court might lawfully presume that sum to be of the public funds of Spokane county, since it will be presumed that trust funds have not been wrongfully misappropriated or criminally used by the officers of the bank. But while that presumption would prevail as to money on hand, it would not be extended to other assets, for the officers of the bank had as little right to divert the public funds into investment in other property as they had to appropriate them to their own use."

In Merchants' National Bank v. School District No. 8, 94 Fed. 705, at pages 706, 707, 708, 36 C. C. A. 432, at page 433, it was said:

"On February 13, 1897, the bank became insolvent, and the receiver took possession of its property and assets, among which was cash in the sum of $19,533, and the receiver collected thereafter from other assets $200,000. The bank has not money or assets sufficient to pay its indebtedness in full. Upon these facts it was held, among other conclusions of law, that said sum of $13,056 was a 'special deposit' with the bank to the credit of the school district, to be applied solely to the redemption and payment of the prior bonds. * * * The fact that it did place it with other funds, and that at the time when its doors were closed there was not in its possession a separate fund in accordance with the understanding had when the deposit was

made, cannot prejudice the rights of the appellee, so long as it can be shown that a sum of money equal to the amount so deposited remained in the possession of the bank, and was there when the receiver took possession. It will be presumed that of the funds so on hand $13,056 belonged to the appellee. Moreland v. Brown, 30 C. C. A. 23, 86 Fed. 257; National Bank v. Insurance Co., 104 U. S. 54 [26 L. Ed. 693]; Capital Nat. Bank v. Coldwater Nat. Bank, 49 Neb. 786, 69 N. W. 115 [59 Am. St. Rep. 572]. It is contended that the finding of the master, to the effect that Palmer deposited with the bank the sum of $13,056, is at variance with the facts as they are disclosed in the evidence. It appears from the evidence that the bonds were sold in Boston, and that the sum realized thereon was deposited with the National City Bank of Boston, which bank was the correspondent of the Helena bank. The Boston bank notified the Helena bank that that amount had been placed to the credit of the latter .by a letter which was received by the bank at Helena on July 11, 1896. On July 3d the Helena bank had with the Boston bank a credit of $39,011.60, against which it drew on that day the sum of $10,000, leaving a balance of $29,011.60, which was not further reduced until July 13th, when a draft for $8,075 was drawn against it. On July 11, 1896, the Helena bank gave the personal account of Palmer a credit on its books of the full amount of the proceeds of the sale of the bonds. Thereupon Palmer gave the bank his personal check for $13,056, and requested that an account be opened as found by the master. Upon these facts it is contended that the money which was realized on the sale of the bonds was never actually deposited with the Helena bank. It is not material in this case whether it was actually so deposited or not. It is undisputed that the money belonged to the school district, and that it was deposited with the bank's correspondent in Boston, and that, upon the receipt of intelligence of such deposit, the Helena bank opened the account, and entered into the agreement which was indicated in the findings of the master. The Helena bank, if it had not then the money in its actual possession, had it under its control, and could lawfully, in the due course of banking, have paid it over to Palmer or to the school district. Instead of so paying the money, it chose to enter into the arrangement which was consummated. Neither the bank nor the receiver is now in a position to say that the money received by the bank's agent was not actually received by the bank. The question is not complicated by any failure on the part of the Boston bank to pay to the Helena bank in full the amount which it received. The Helena bank received the money in the due course of business. In view of the receipt of that sum by its agent, and the arrangement which it made with Palmer on behalf of the school district, it will be deemed to have diverted from its funds in bank on July 11, 1896, the sum of $13,056, and to have placed the same to the credit of the school district. That sum became and was from that date a trust fund, subject to disbursement only upon the order of the school district."

The present case appears to fall squarely within the rule announced in these cases. The same presumption will obtain in the present case of a diversion by the bank of the amount of this collection, in excess of the portion of the $10,000 bond applicable, and that it was thenceforth held by the bank as a trust fund. In the last case cited the court points out the fact of the arrangement by the bank with Palmer for a special deposit. While that fact strengthened the presumption of the preservation of the trust fund, such presumption also arose because of the fact of the wrongful taking of the money by the bank, contrary to the statutory provision, as such taking would make it the bank's duty so to do. It would appear that the court's reference to the arrangement between the bank and Palmer for a special deposit was made to show that the bank had ceased to act as a collection agent and had become a depositary.

The fact that the correspondent bank collected the purchase price of the bonds and gave the United States National Bank credit, not

remitting coin or currency, in principle, does not change the rule. The correspondent bank was the agent of the United States National Bank and an authorized reserve bank. The agent's possession was possession of the principal. If the National Bank of Commerce had remitted the United States National Bank by draft on New York or Chicago, it would not, thereby, any more nearly have gotten the actual money collected into the vaults of the United States National Bank than was done by the National Bank of Commerce giving the United States Bank credit, which was drawn against by the latter in the regular course of business.

The cash items, including cash, handled daily by a bank, constitute a particular fund, aside from its general assets and property. It is recognized as a separate fund by section 5191, R. S. (5 Fed. Stat. Ann. 124). A fund of this character is so liquid in its nature that a trust fund once traced into it, the attempt, unaided by presumption, to separate it from the mass is as futile as to pick a wanted coin from a bag of its fellows. The money being received and the credit given the treasurer, the proceeds of these bonds entered into this cash fund of the United States National Bank, and thereafter, in expending money from this fund, whether paid out over the bank's counter in Centralia, or by draft, or check on the Seattle correspondent and reserve bank, or upon any of its other correspondents and reserves, to which it may have shifted its credit in the National Bank of Commerce, the presumption would be that such expenditure was from the bank's money, and that the trust fund remained untouched, as much so as though the money were taken from one stack or another of coin upon the bank's own counter.

With the constant and daily shifting of cash credits and balances, forth and back, and between the bank and its correspondents, there is no more of a presumption that the trust fund remained with the correspondent bank until wiped out by the overdraft than there would be —if it were traced, with other money, into a particular drawer on entering the bank (one of a number of drawers into which coin was daily placed and from which it was as often taken), which particular drawer was found empty upon the bank's failure—that it had been lost and dissipated, though money remained in the other drawers. Neither the rule in San Diego County v. California National Bank (C. C.) 52 Fed. 59, nor that in Multnomah County v. Oregon National Bank (C. C.) 61 Fed. 912, is opposed to the present holding, and it is not clear that either of those cases is opposed to the holding of the other. Each of them was determined on demurrer.

In Multnomah County v. Oregon National Bank the court recites that "the county and city whose funds have been wrongfully commingled with the funds of the bank, and *paid out*," sought to secure a preference over the other creditors. The relief sought was that a lien be established on account of the deposited funds "upon all the moneys, choses in action, and other property in said bank." The court held that such a lien upon the general assets of the insolvent bank was not warranted.

In San Diego County v. California National Bank the complainant recited:

"That the defendant receiver has, since his appointment, received of the assets of the bank a sum sufficient to pay and satisfy the amounts deposited by the treasurer and tax collector."

This is not equivalent to saying that such sum was realized by the receiver from the general assets of the bank. There is no language used in the opinion holding that such a trust fund would constitute a lien upon the general assets of the bank. Judge Ross, who wrote the opinion in the last case, was a member of the court which decided the case of Merchants' National Bank v. School District No. 8, 94 Fed. 705, 36 C. C. A. 432, wherein the case of Spokane County v. First National Bank, 68 Fed. 979, 16 C. C. A. 81, was expressly approved, without any dissent by Judge Ross, though it was plainly held therein that a general lien upon the assets would not result from such a special deposit or trust.

[4] It is urged that complainant should not be accorded the relief prayed; that it should be required first to seek to recover from the city treasurer and his bondsmen and the city commissioner of finance. It is contended that the rule for the marshaling of securities requires this. There being no assurance that from such suits sufficient would be realized to make complainant whole, and it being clear that, before that fact could be ascertained, the receivership would have been closed up and final disposition made of all the bank's assets, the situation does not warrant, on that ground, the denial of injunctive relief.

Complainant asks that the making of any dividend whatever be enjoined until certain other threatened suits to impress a trust on the funds in the receiver's hands shall be brought and determined. This is not warranted by what has been made to appear. A temporary injunction will issue, enjoining the receiver from declaring any dividend that will encroach upon the amount necessary to cover the city's deposits, after deducting the $10,000 paid by the bonding company and making allowance for the expenses of administering the estate.

Upon the final hearing it will be necessary to determine what part of the $51,911.88 was a general deposit covered by the $10,000 bond, and whether such amount exceeds that received from the bonding company and applied thereto in payment, after the payment of the $2,641.21.